AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)  ☐ Original  ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| United States of America<br><br>v.<br><br>GABRIEL ADRIAN SMANIEGO,<br><br>aka "Squeaks"<br><br>Defendant | Case No. 2:22-mj-02157-DUTY |

FILED
CLERK, U.S. DISTRICT COURT
06/01/2022
CENTRAL DISTRICT OF CALIFORNIA
BY: ___GR___ DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of May 24, 2022 in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g) | Felon in Possession of a Firearm |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/
Complainant's signature

Andrew Dama, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: 6/1/2022

*Judge's signature*

City and state: Los Angeles, California

Hon. Karen Stevenson, U.S. Magistrate Judge
*Printed name and title*

AUSA Kevin J. Butler x6495

**AFFIDAVIT**

I, Andrew Dama, being duly sworn, declare and state as follows:

## I. BACKGROUND OF AFFIANT

1. I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since January 2021. I received basic law enforcement training at the FBI Academy in Quantico, Virginia, from January 2021 to June 2021. This training included segments on conducting criminal investigations, narcotics identification, firearm crimes, gangs, and other law enforcement topics. I am currently assigned to the Los Angeles Metropolitan Task Force on Violent Gangs (the "Task Force"), a multi-agency task force led by the FBI, which includes the Los Angeles Police Department and the Los Angeles Sheriff's Department.

2. Prior to becoming an SA, I was employed as a Police Officer for the City of Lansing, Michigan from March 2017 to January 2021. During this time, I served in various roles, including patrol officer, and community police officer. During my tenure as a police officer, I investigated violations of both state and federal law, to include gang narcotics and firearms violations.

3. During my tenure with the FBI, I have participated in numerous investigations of violent crime, drug trafficking organizations, and large-scale street gangs, including criminal enterprise investigations that have involved court-authorized interception of wire, oral, and electronic communications. I have become familiar with the methods, language, structures, and

criminal activities of street gangs and transnational organized crime groups, including the Mara Salvatrucha ("MS-13") gang, operating in and through this judicial district. I have become familiar with the street- and leadership-level extortion activities of these gangs, as well as their reliance on firearms.

## II. PURPOSE OF AFFIDAVIT

4.   This affidavit is made in support of a criminal complaint and arrest warrant against GABRIEL ADRIAN SAMANIEGO ("SAMANIEGO") for a violation of 18 U.S.C. § 922(g)(1): Felon in Possession of a Firearm.

5.   This affidavit is also made in support of an application for a warrant to search the following digital device, in the custody of the Los Angeles County Sheriff's Department ("LASD"), in Los Angeles, California, as described more fully in Attachment A:

   a.   A T-Mobile, unknown model cellular phone, IMEI number 357492496380765, (the "SUBJECT DEVICE"), seized from the bed of a pickup truck SAMANIEGO's father used to escape the shooting scene, believed to be shared by SAMANIEGO and his father, and is currently in the custody of the Los Angeles County Sheriff's Department in the Central District of California;

6.   The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 922(g) (Felon in Possession of a Firearm), 924(c) (Possess/Brandish/Discharge a

2

Firearm in Furtherance of a Crime of Violence), and 1959(a)(1), (6) (Violent Crime in Aid of Racketeering: attempted murder and assault with a deadly weapon) (the "Search Warrant Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

7. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. SUMMARY OF PROBABLE CAUSE

8. On May 24, 2022, SAMANIEGO, a four-time convicted felon and member of the criminal street gang Varrio Nuevo Estrada Courts ("VNE"), possessed a Glock Model 17 9mm firearm, which he used to fire at multiple California Highway Patrol ("CHP") Officers. The firearm was loaded with a high-capacity magazine carrying 10 rounds of 9mm ammunition, with one 9mm round loaded in the chamber.

9. The SUBJECT DEVICE was recovered in the bed of a pickup truck that SAMANIEGO's father commandeered to escape the scene of the shooting and was recovered by the LASD after the victims drove to the LASD East Los Angeles Station.

## IV. STATEMENT OF PROBABLE CAUSE

10. Based on my review of law enforcement reports, conversations with other law enforcement agents, video recordings, and my own knowledge of the investigation, I am aware of the following:

### A. Background on VNE, the Enterprise

11. VNE, including its leaders, members, and associates, constitutes an enterprise as defined in 18 U.S.C. § 1959(b)(2), that is, a group of individuals associated in fact that was engaged in, and the activities of which affected, interstate and foreign commerce. VNE, though its members and associates, engaged in racketeering activity, as set forth in 18 U.S.C. §§ 1959(b)(1), 1961(1), that is, acts involving murder and robbery, in violation of California law, and offenses involving trafficking in controlled substances, in violation of 21 U.S.C. § 846.

   a. VNE is a multi-generational gang founded in the Estrada Courts housing project in the Boyle Heights neighborhood of Los Angeles, California in the early 1940s. Through time, VNE has expanded to occupy other local cities within the greater Los Angeles County area. These cities include East Los Angeles, Montebello, Bell Gardens and Lancaster. VNE has a membership of approximately 400 members with approximately (7) Cliques. V.N.E. cliques include the Tiny Locos (Montebello), Diablos, Tic Tocs (Montebello), Sharks, Malos, Crazy Gangsters and Primos (Lancaster).

b.   VNE has several Cliques, which makes their territory or boundaries difficult to define.  However, within the City of Montebello, the territorial boundaries are as follows:  Roosevelt Avenue on the north, Bluff Road on the east, Greenwood Avenue on the west and Washington Boulevard on the south.  These boundaries have been determined by criminal activity committed by members of the gang, along with documented gang graffiti, which is a method commonly used by gangs to claim their territory.

c.   VNE has long been involved in a wide range of criminal activity which includes narcotic sales, robbery, assaults, and assault with a deadly weapon, grand theft auto, carjacking, burglary, weapons violations and murder.

d.   VNE is controlled by members and associates of the "Mexican Mafia," or "La Eme."  The Mexican Mafia is an organized group of individuals who controls much of the drug distribution and other criminal activities within California State Prisons, local county jails, and some federal prisons.  Members of the Mexican Mafia come from the ranks of local street gangs, including VNE.  In return for allowing local street gangs to maintain control over their territories and for protecting the gangs' members and associates during periods of incarceration, the Mexican Mafia requires the gangs to collect and pay "taxes" on drug trafficking and other illicit and illegal conduct taking place in those territories (hereinafter,

"extortionate taxes"). These illicit funds are intended to be controlled by, and are often held in trust by, gang members and associates for the Mexican Mafia member(s) in charge of a particular area. Members and associates of VNE regularly pay extortionate taxes to the Mexican Mafia members who oversee the gang; and the collection of extortionate taxes from drug dealers operating within VNE's territory is a primary task of the gang's leadership on the streets, as is punishing individuals who fail to pay the requisite extortionate taxes.

    **B.**    **SAMANIEGO is a VNE Member**

    12.  Based on my training and experience, and conversations with other law enforcement officers and agents, as well as my familiarity and personal involvement with this investigation, I am aware of the following: SAMANIEGO is a VNE member who is known to associate with other VNE gang members. Multiple sources have identified SAMANIEGO as a member of VNE, with a moniker of "Squeaks." Based on my training and experience, monikers are a common way to refer to gang members and associates, and to evade law enforcement detection (versus the use of real names).

    **C.**    **The April 30, 2022 Shooting**

    13.  On April 30, 2022, there was a shoot-out at a 7-Eleven Store on the corner of Beach Street and Greenwood Avenue in Montebello, California between two individuals: Suspect 1 and

Suspect 2.  Suspect 1 approached Suspect 2, exchanged words, and retrieved a firearm from his front waistband.  Suspect 2 also retrieved a firearm from his front pants pocket.  The two suspects then fired multiple rounds at each other while backing away from one another.  The store clerk and numerous patrons were present, but no one was physically injured.  The incident was captured on the store surveillance video system.

14.  Montebello Police Department Detectives believed the suspects to be rival gang members.  Detectives attempted to identify the shooters but were initially unsuccessful.  On May 19, 2022, detectives posted the surveillance footage and still images of the shooters on social media and asked the public for help identifying the subjects.

15.  Within 24 hours, detectives received multiple anonymous Crime Stopper tips positively identifying Suspect 1 as SAMANIEGO and indicating that SAMANIEGO is a member of VNE.  Tipsters also identified SAMANIEGO's father as being present at the 7-Eleven at the time of the incident.  To date, Suspect 2 has not been identified.

16.  On May 21, 2022, Montebello Police Department obtained a warrant for SAMANIEGO's arrest.

   D.   **The May 24, 2022 Shooting**

17.  On May 24, 2022, at approximately 9:02 a.m., SAMANIEGO and his father, Gabriel Samaniego, Sr. ("Senior"), were walking Southbound on Ford Boulevard at 3rd Street in Los Angeles, CA.  Upon seeing an approaching marked CHP Vehicle ("CHP Vehicle 1"), SAMANIEGO removed a firearm from his waistband and fired

7

multiple rounds at CHP Vehicle 1, hitting front and rear driver's side doors.  SAMANIEGO continued firing as CHP Vehicle 1 turned right onto 3rd Street, hitting and shattering the rear windshield of CHP Vehicle 1.

18.   After CHP Vehicle 1 departed the immediate area, SAMANIEGO paced at the intersection, appearing to be waiting for the arrival of additional law enforcement officers.  As additional CHP, LASD, and Transportation Services Bureau ("TSB") vehicles arrived, SAMANIEGO fired additional rounds at the vehicle and officers.  Multiple officers fired back at SAMANIEGO.  SAMANIEGO continued firing at officers until his gun was disabled by an officer's bullet.  SAMANIEGO was struck five times on the right side of his body.  Numerous law enforcement vehicles and one civilian vehicle were struck by SAMANIEGO's shooting, but no one else was physically injured.

19.   SAMANIEGO was transported by ambulance to Los Angeles County-USC Medical Center where he was treated for multiple gunshot wounds.  SAMANIEGO is currently in stable condition.

**E.   Recovery of the Glock Firearm and Ammunition**

20.   Investigators recovered a Glock Model 17 9mm firearm with an extended 17-round magazine carrying 10 9mm rounds, with one additional 9mm round in the chamber.  The Glock firearm was recovered from the sidewalk where SAMANIEGO was arrested.  Investigators also recovered 18 spent 9mm casings and an empty magazine from the street and sidewalk area where SAMANIEGO had been firing at officers.

**F.     Recovery of the SUBJECT DEVICE**

21.   As SAMANIEGO opened fire at CHP Vehicle 1, Senior ran and hid behind a silver pickup truck with two occupants in the cab that was stopped at the red light on 3rd Street facing eastbound at the intersection of Ford Boulevard.  After SAMANIEGO fired multiple rounds at CHP Vehicle 1, he turned toward the pickup truck and motioned for the occupants to drive away.  Senior then jumped into the back of the pickup truck.  Once the light turned green, the driver of the pickup truck made a U-Turn and drove away westbound on 3rd Street toward the southbound 710 freeway.

22.   Once on the freeway, the occupants of the silver pickup truck noticed Senior in the bed of the truck.  The occupants believed that Senior was armed with a firearm.  Senior directed them to the 6900 block of Bandini Boulevard in the City of Commerce, where he jumped from the truck and fled.  The truck occupants then discovered the SUBJECT DEVICE in the bed of the truck, which they turned in to the LASD East Los Angeles Station.

23.   The SUBJECT DEVICE was searched pursuant to a search warrant issued by a California Superior Court Judge on May 24, 2022.  An initial search of the phone indicates that it was shared by SAMANIEGO and Senior.

24.   Investigators saw a text message on the SUBJECT DEVICE indicating that SAMANIEGO was a user of the device.

25.   FBI seeks a federal warrant to search for evidence of the Search Warrant Subject Offenses.

### G. SAMANIEGO's Criminal History

26. On May 31, 2022, I reviewed certified conviction documents for SAMANIEGO and learned that SAMANIEGO has previously been convicted of the following felony crimes punishable by a term of imprisonment exceeding one year:

    a. Vandalism, a violation of California Penal Code Section 594(a), in the Superior Court for the State of California, County of Los Angeles, Case Number BA467296, on or about September 26, 2018;

    b. Possession of Methamphetamine, a violation of California Health and Safety Code Section 11377(a), in the Superior Court for the State of California, County of Los Angeles, Case Number BA408500, on or about March 14, 2014;

    c. Felon in Possession of a Firearm, a violation of California Penal Code Section 12021(a)(1), in the Superior Court for the State of California, County of Los Angeles, Case Number BA355552, on or about December 9, 2009; and

    d. Assault with a Firearm, a violation of California Penal Code Section 245(a)(2), in the Superior Court for the State of California, County of Los Angeles, Case Number BA323451, on or about January 29, 2008.

### H. Interstate Nexus

27. On May 31, 2022, FBI Special Agent Christopher Harris, who is a certified FBI interstate nexus examiner, examined photographs of the firearm recovered from the sidewalk where SAMANIEGO was arrested. Special Agent Harris confirmed that the firearm was manufactured outside of California. Because the

firearm was found in California, it is Special Agent Harris's opinion that the firearm traveled in and affected interstate commerce.

### I. There is Probable Cause to Believe the Shootings Were Committed to Increase or Maintain Position in VNE

28. VNE is a long-standing criminal street gang.

29. I understand that, for the purposes of the Search Warrant Subject Offenses, the crime of violence had to have been committed for the purpose of gaining entrance to or maintaining or increasing position in the charged enterprise.  Here, I believe there is probable cause to believe the Subject Offenses were committed to maintain and increase position in VNE.

30.  The April 30, 2022 7-Eleven shooting occurred in the heart of VNE territory, in Montebello.  VNE uses violence in order to "protect" the gang's neighborhood and territory.

31.  The shootings were also committed by a documented VNE gang member.  The commission of such crimes, particularly violent crimes, serve to preserve, protect, and expand the enterprise's criminal operations, and to promote discipline and enforce the rules within the VNE gang, and to promote a climate of fear.  This climate of fear is necessary to maintain VNE's stronghold over their territory.

### V. TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

32. From my training, personal experience, and the collective experiences related to me by other law enforcement

11

officers who conduct who conduct firearms investigations, I am aware of the following:

    a. Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices. It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals. Such information is also kept on digital devices.

    b. Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices. These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

    c. Those who illegally possess firearms often sell their firearms and purchase firearms. Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices. This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price. In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale.

In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

33. As used herein, the term "digital device" includes the SUBJECT DEVICE.

34. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

   a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

   b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been

13

used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

        c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

        d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

    35.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data

14

during a search of the premises for a number of reasons, including the following:

      a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

      b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

///

///

///

## VII. CONCLUSION

36. For all of the reasons described above, there is probable cause to believe that SAMANIEGO has committed a violation of 18 U.S.C. § 922(g)(1): Felon in Possession of a Firearm. There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICE described in Attachment A.

Andrew Dama, Special Agent
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this  1st  day of June, 2022.

THE HONORABLE KAREN STEVENSON
UNITED STATES MAGISTRATE JUDGE